IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-34

No. 249A21

Filed 18 March 2022

IN THE MATTER OF D.D.M.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) (2019) from an order entered on 27 May 2021 by Judge Clifton H. Smith in District Court, Catawba County. This matter was calendared for argument in the Supreme Court on 18 February 2022 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Maranda W. Stevens for petitioner-appellee Catawba County Department of Social Services.*

*Michelle FormyDuval Lynch for appellee Guardian ad Litem.*

*Richard Croutharmel for respondent-appellant mother.*

EARLS, Justice.

Respondent-mother appeals from the trial court's order terminating her parental rights to her minor child D.D.M. (Damion).[1] She argues that the trial court committed reversible error in concluding that grounds existed to terminate her parental rights based on neglect and willful failure to make reasonable progress in

---

[1] This is a pseudonym used to protect the juvenile's identity. The father's parental rights to Damion were also terminated, but he did not participate in this appeal.

correcting the conditions that led to removal under N.C.G.S. § 7B-1111(a)(1) and N.C.G.S. § 7B-1111(a)(2). After careful review of the record and consideration of the briefs of counsel, we affirm the trial court's order terminating respondent-mother's parental rights.

## I.    Factual and Procedural Background

Damion was born to respondent-mother on 14 August 2016 in Mecklenburg County. Damion was born at thirty-five weeks gestation with a heart defect and lung problems that required multiple corrective surgeries and resulted in Damion's extended need for oxygen and his intolerance of oral feedings, which required him to have a feeding tube. In October 2016, the Mecklenburg County Department of Social Services (MCDSS) received a child protective services report alleging that Damion was suffering from medical neglect under the care and custody of respondent-mother, as respondent-mother was allegedly not meeting his needs during his hospitalization and there had been an altercation between respondent-mother and Damion's father at the hospital. Hospital staff first expressed concerns about respondent-mother's ability to care for Damion upon his release from the hospital in November 2016 following his birth. After Damion's release from the hospital, respondent-mother was inconsistent with Damion's medical care. He missed multiple appointments with his various medical providers and missed in-home services including nursing and occupational therapy. On 8 December 2016, MCDSS received another child protective

services report alleging respondent-mother's sustained medical neglect of Damion. The allegations in the report mirrored those that were raised in the October report.

¶ 3    In February 2017, the case was transferred to family in-home services through the Catawba County Department of Social Services (CCDSS) when respondent-mother relocated to Hickory, North Carolina. Special services were instituted to assist respondent-mother with Damion's care, and despite having access to these services, respondent-mother continued to be inconsistent in meeting Damion's medical needs. Damion's condition did not improve. On 22 June 2017, respondent-mother delayed bringing Damion to the hospital for fifteen hours after she was told by healthcare providers that he needed to be seen immediately because his feeding tube was dislodged following an altercation between respondent-mother and Damion's grandmother. When Damion was admitted to the hospital, his blood sugar was extremely low because he had not received any nourishment for approximately fifteen hours. Respondent-mother's delay in taking Damion to the hospital placed him at risk of a seizure, and when he was finally dropped off for admittance, medical providers did not see respondent-mother again until Damion was ready to be discharged seven days later.

¶ 4    On or about 12 July 2017, Damion's pediatrician contacted the hospital where he had received care and expressed continued concerns regarding his weight loss. Damion was immediately referred to the emergency department for evaluation, and

he was ultimately admitted to an inpatient unit. Upon his readmission to the hospital, Damion had lost considerable weight from his discharge weight on 29 June 2017. As had been the case in June, no family was present to accompany Damion or provide physicians with his medical history, nor was respondent-mother present to receive education about how to properly care for Damion's medical needs. Damion's medical providers attributed his limited progress to respondent-mother's inability to appropriately meet his healthcare needs and they also raised concerns that respondent-mother suffered from untreated mental health diagnoses. While hospitalized, Damion's weight improved. Medical providers ultimately concluded that Damion's ongoing weight loss and lack of weight gain was related to the poor care that he had been receiving while in respondent-mother's home. Medical providers determined that Damion could not be safely released to respondent-mother following his readmission to the hospital in July.

¶ 5    On 27 July 2017, CCDSS filed a petition alleging that Damion was a neglected and dependent juvenile. The District Court, Catawba County granted non-secure custody of Damion to CCDSS on 28 July 2017. Thereafter, Damion was placed in a foster home where he received proper medical care, began to steadily gain weight, and caught up with age-appropriate developmental milestones. Meanwhile, respondent-mother failed to follow through with a mental health evaluation and treatment, stormed out of a scheduled appointment with a counselor after she did not

receive medication, and obstructed efforts made by social services to obtain her signature for a case plan for Damion. Between the filing of the petition and the adjudication hearing in March, April, and May of 2018, respondent-mother had exercised only sporadic visitation with Damion and attended just seven of the thirty visits that were made available to her after Damion was placed in foster care.

¶ 6    After a hearing on 30 May 2018, Damion was adjudicated a neglected and dependent juvenile. The trial court awarded CCDSS legal custody of Damion and respondent-mother was allowed supervised visitation with him for four hours per month. The trial court also ordered respondent-mother to enter into and comply with a case plan for reunification purposes. The trial court ordered that respondent-mother:

>    a.  Complete comprehensive medical training to meet the medical needs of her infant son;
>    b.  Complete a full psychological evaluation and follow recommendations;
>    c.  Provide and maintain stable housing;
>    d.  Maintain employment; and
>    e.  Consistently show the capacity to attend all scheduled appointments and meet all medical needs of her minor child.

Respondent-mother was also ordered to provide the court at the next hearing with evidence of efforts she had made to improve her transportation situation. Social workers continued to make efforts to help respondent-mother comply with her case plan. By the next hearing date on 17 September 2018, respondent-mother had only

visited with Damion three times, despite the social worker's efforts to arrange transportation for the visits.

¶ 7 Over the next year, from October 2018 to October 2019, the trial court continued to enter permanency-planning orders as to Damion with the same case plan requirements. Between 2018 and 2019, the trial court found that overall, respondent-mother failed to make reasonable progress on correcting the conditions that led to Damion's removal, and that she did not follow through on complying with many of the requirements of her case plan.

¶ 8 On 17 December 2019, CCDSS moved to terminate respondent-mother's parental rights to Damion for neglect pursuant to N.C.G.S. § 7B-1111(a)(1), failure to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2), and failure to pay a reasonable portion of Damion's cost of care pursuant to N.C.G.S. § 7B-1111 (a)(3). After a hearing on the motion, the trial court concluded that grounds existed to terminate respondent-mother's parental rights to Damion under N.C.G.S. § 7B-1111(a)(1) and (a)(2) and determined that termination was in Damion's best interests. Respondent-mother appeals.

## II. Analysis

¶ 9 On appeal, respondent-mother challenges the trial court's adjudication that grounds existed to terminate her parental rights for willful failure to make

reasonable progress to correct the conditions that led to Damion's removal. Our standard of review is well-established:

> When reviewing the trial court's adjudication of grounds for termination, we examine whether the court's findings of fact are supported by clear, cogent[,] and convincing evidence and whether the findings support the conclusions of law. Any unchallenged findings are deemed supported by competent evidence and are binding on appeal. The trial court's conclusions of law are reviewed de novo.

*In re Z.G.J.*, 378 N.C. 500, 2021-NCSC-102, ¶ 24 (cleaned up). The trial court's findings of fact that are supported by clear, cogent, and convincing evidence are deemed conclusive even when some evidence supports contrary findings. *In re Helms*, 127 N.C. App. 505, 511 (1997).

¶ 10        Here, the trial court concluded that respondent-mother willfully left Damion in foster care or a placement outside the home for more than twelve months without showing to the court's satisfaction that she made reasonable progress to rectify the conditions that led to his removal under N.C.G.S. § 7B-1111(a)(2). Respondent-mother does not dispute adjudicatory findings of fact 1 through 23. Those findings specify the ways that respondent-mother failed to make reasonable progress on correcting the conditions which led to Damion's removal during the forty-six months that he spent in foster care before her parental rights were terminated. Among other things, respondent-mother was specifically ordered to complete a full psychological evaluation and follow any recommendations, which may have aided in her capacity

to adequately manage Damion's extensive and serious medical needs.

¶ 11 After respondent-mother completed a mental health assessment, she was diagnosed with adjustment disorders, including mixed anxiety and depressed mood. Consequently, respondent-mother's evaluating clinician recommended that she participate in therapy up to two times per week, submit to a psychiatric evaluation, and obtain crisis services to reduce the risk of harm to herself and others. Respondent-mother failed to follow through with the recommended outpatient therapy and did not obtain the recommended psychiatric evaluation until almost two years after Damion was placed into CCDSS's custody. After respondent-mother finally completed the court-ordered evaluation, which resulted in a diagnosis of bipolar I disorder, her mental illness remained untreated. Respondent-mother's evaluating clinician, Dr. Jennifer Cappelletty, emphasized that respondent-mother's "untreated mental illness has contributed to her overall instability, poor judgment, unhealthy interpersonal relationships, and emotional dysregulation that have negatively impacted her capacity to effectively parent her children."

¶ 12 Throughout the history of this case respondent-mother's untreated mental health disorders caused Damion's doctors to be concerned that her illnesses contributed to her inability to properly attend to Damion's medical needs, and ultimately, respondent-mother's mental health challenges led to Damion's removal for neglect. The undisputed findings of fact in the trial court's order are based on the

clear, cogent, and convincing evidence that respondent-mother failed to obtain treatment for her mental illness even though she received a psychiatric evaluation confirming the detrimental effect of her illness on her parenting abilities and recommending that she receive treatment. Respondent-mother's failure in this regard ultimately prevented her from making reasonable progress under the circumstances to correct the conditions which led to Damion's removal within the meaning of N.C.G.S. § 7B-1111(a)(2). Because respondent-mother does not contest these findings of fact on appeal, they are deemed to be supported by sufficient evidence. *In re Clark*, 159 N.C. App. 75, n.5 (2003) (citing *In re Caldwell*, 75 N.C. App. 299, 301 (1985)).

¶ 13    Respondent-mother argues that the trial court impermissibly terminated her parental rights based on N.C.G.S. § 7B-1111(a)(2) because it failed to consider the extent to which her inability to care for Damion was due to her being impoverished. The applicable statute requires that "[n]o parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty." N.C.G.S. § 7B-1111(a)(2) (2021). Here, it was respondent-mother's failure to make reasonable efforts to complete her case plan, rather than her lack of financial resources, that was the basis of the trial court's order. For example, social workers who attempted to engage with respondent-mother consistently offered her transportation to Damion's medical appointments and visitations, and when

respondent-mother moved to Durham County she was given the option of participating in virtual visitations if in-person visitations became infeasible. Additionally, the trial court found that respondent-mother did not demonstrate the sustained behavioral change that was necessary for Damion to be safely returned to her care.

¶ 14    Furthermore, respondent-mother had difficulty maintaining consistent employment while Damion was placed elsewhere. She quit her job at Taco Bell in January 2019 and then began working at an assisted living facility in May 2019. But at the time of the trial court's order terminating her parental rights, respondent-mother had been unemployed since the birth of her youngest child in or around March 2020. On balance, the trial court's findings demonstrate that respondent-mother could have sought to comply with the requirements of her case plan even while experiencing otherwise insufficient monetary resources.

¶ 15    We therefore hold that the trial court properly determined grounds existed to terminate respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(2). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights," and it is not necessary to address the sufficiency of the trial court's conclusions of law or findings of fact relative to any other ground. *In re E.H.P.*, 372 N.C. 388, 395 (2019); *see also In re T.N.H.*, 372 N.C. 403, 413 (2019). Thus, we decline to reach the question of whether the trial court

properly terminated respondent-mother's parental rights for neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

## III. Conclusion

We conclude that the trial court did not err in adjudicating the existence of grounds for termination of respondent-mother's parental rights in Damion. Respondent-mother does not challenge the trial court's determination that termination of her parental rights was in Damion's best interests. We therefore hold that the trial court based its findings of fact and conclusions of law on sufficient evidence and appropriately terminated respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(2) and that termination was in Damion's best interest. In light of the foregoing, the order terminating respondent-mother's parental rights must be affirmed.

AFFIRMED.